UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

FREDERICK SILVERS,

Defendant

Criminal Action No. 21-124 (CKK)

**MEMORANDUM OPINION AND ORDER**
(August 11, 2022)

Defendant Frederick Silvers ("Defendant" or "Mr. Silvers") is charged by indictment with: (1) Conspiracy, in violation of 18 U.S.C. § 371; and (2) Bribery, in violation of 18 U.S.C. §§ 201(b)(1)(A) and (C). In his [16] Motion to Suppress Statements, Defendant requests the Court suppress admissions made to law enforcement during the execution of a search warrant at his home approximately two years ago. Defendant argues that he was in police custody at the time of the interrogation and that law enforcement never read him his *Miranda* rights. Because the Court concludes that Defendant was not in custody at the time of interrogation, and upon consideration of the pleadings,[1] the evidentiary hearing, the relevant legal authorities, and the record as a whole, the Court **DENIES** Defendant's [16] Motion to Suppress Statements.

**I.   FINDINGS OF FACT**

The Court held an evidentiary hearing on Defendant's motion to suppress on July 18, 2022 and August 4, 2022. The Court has considered the evidence presented during the hearing. In

---

[1] The Court's consideration has focused on the following materials:
- Defendant's Motion to Suppress Statements and Request for Evidentiary Hearing ("Mot."), ECF No. 16;
- The Government's Opposition to Defendant's Motion to Suppress Statements ("Opp."), ECF No. 18; and
- Defendant's Reply to United States Opposition to Defendant's Motion to Suppress Statements ("Repl."), ECF No. 19.

1

doing so, the Court considered the demeanor and behavior of the witnesses, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case.  The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence.  The Court has also considered the pleadings and, more generally, the entire record in this case.

Three witnesses testified during the evidentiary hearing:  Special Agent Andrew Waltz of the Federal Bureau of Investigation on behalf of the Government, Special Agent Jamie Stranahan of the Federal Bureau of Investigation on behalf of the Government, and Faith Silvers on behalf of Defendant.[2]

The Court makes the following findings of fact.  The Court will first make findings of fact that are relevant to Defendant's Motion and undisputed and/or unrebutted; the Court will then make findings as to facts that are relevant and disputed or controverted by some evidence.  The Court credits the following.

### A. Uncontroverted Evidence

On October 28, 2019, the Federal Bureau of Investigation ("FBI") executed a search warrant at Mr. Silvers' home in Fort Washington, Maryland. Opp. at 1.  Law enforcement arrived

---

[2]  Defendant himself also took the stand.  His testimony has been stricken from the record by consent pursuant to the Court's July 21, 2022 Minute Order, and the Court does not consider his testimony in any way here.

at approximately 6:00 AM.  Aug. 3, 2022 H'rg Tr. ("Tr. 2") at 11:8.  By that time, the sun had risen.  *Id.* at 11:9-10.  Law enforcement was split into two teams:  agents who would conduct the search and agents who would attempt to interview Mr. Silvers.  July 18, 2022 H'rg Tr. ("Tr. 1") at 21:22-24.  Stranahan and Waltz were the interviewing agents.  *Id.* at 26:18.  Altogether, there were approximately a dozen agents who executed the search warrant, including Stranahan and Waltz.  Tr. 1 at 6:4-5.  Those who conducted the sweep wore jackets or vests indicating they were law enforcement.  *Id.* at 39:4.  No SWAT team was involved and no agents carried long guns.  *Id.* at 7:5-6.

The search began by the first team knocking on Mr. Silvers' front door and announcing themselves.  *Id.* at 7:20-22.  No battering ram was wielded and firearms remained holstered at that time.  *See* Tr. 2 at 11:17-18.  Agent Waltz stood several yards away, within eyesight of the front door but only barely within earshot.  *See* Tr. 1 at 23:21-24.  Agent Stranahan, eight-months pregnant and unarmed, waited in a car several houses away, within eyesight of the front door but not within earshot.  Tr. 2 at 12:2, 12:7.  Mr. Silvers answered the door and law enforcement directed the occupants of the house (Mr. Silvers, his wife, and his daughter) to exit and stand with Agent Waltz.  Tr. 1 at 7:23-25, 8:3.  Before exiting, and prior to the protective sweep of the house, Mr. Silvers' wife asked an agent whether she could put on additional clothing, and the agent escorted Mr. Silvers' wife to do so.  That agent then escorted Mr. Silvers' wife outside with the remaining occupants.  *Id.* at 38:9-11.  She was escorted because the protective sweep had yet to occur.  Once outside, a protective sweep of the house was conducted.

Law enforcement inside the house holstered their weapons when they completed the protective sweep and informed Waltz, still standing near the occupants, that it was safe to reenter the home.  *Id.* at 8:2-21.  Immediately after reentering the house, Agent Waltz asked Mr. Silvers

whether there was a place where Agents Waltz and Stranahan could speak with Mr. Silvers outside the presence of his family. *Id.* at 9:21-25. Agent Stranahan entered the house shortly thereafter, and she, Agent Waltz, and Mr. Silvers then went from the living room on the main floor of the house upstairs to the master bedroom. *See* Tr. 2 at 19:17-23.

Once up the stairs, Mr. Silvers directed Agent Waltz and Stranahan into the bedroom. Agent Waltz and Mr. Silvers sat on the bed while Agent Stranahan stood nearby with a notepad. *Id.* at 20:3-5. Neither agent obstructed the exit to the room. *Id.* at 21:22-24. Agent Waltz explained that the search and interview concerned "a bribery investigation and that we [the FBI] wanted to ask him questions about his involvement in the [alleged bribery scheme]." Tr. 1 at 10:13-14. Although he appeared "nervous," Mr. Silvers was "very amenable" to being interviewed. Tr. 2 at 22:2-3. The interview was conversational and focused on alleged payments made by Mr. Silvers to a government official (and cooperating witness in this case and similar cases also pending before this Court). *See* Tr. 1 at 10:13-14. At one point during the interview, a third agent entered the room (either by opening the closed door or walking through an open doorway) and asked for the password to one of Mr. Silvers' phones. Tr. 2 at 22:13-16. Mr. Silvers volunteered the password. Tr. 1 at 11:20-22. At the end of the interview, Agent Waltz asked if Mr. Silvers would complete a written statement. *Id.* at 27:18. When Mr. Silvers insisted that he would not do so without first consulting an attorney, Agents Waltz and Stranahan ended the interview. Tr. 1 at 27:19-20.

During the interview, only Agent Waltz carried a firearm, concealed beneath plainclothes. See *id.* at 11:23-25. Agent Stranahan was unarmed. Tr. 2 at 12:2. Law enforcement never told Mr. Silvers that he could not leave the bedroom or the house, and neither told Mr. Silvers that compliance with the interview was mandatory. During the interview, Mrs. Silvers remained on

4

the living room couch downstairs with her daughter. Tr. 1 at 35:22-23. At least one law enforcement officer was also present in that room while the remaining agents conducted the search. *Id.* at 50:1-4. The interview lasted approximately thirty to forty minutes, after which time Mr. Silvers walked back downstairs to the living room. *See* Tr. 1 36:11. At no point was Defendant ever read his *Miranda* rights.

### B. Contested Evidence

The parties contest two salient points: (1) how law enforcement initially entered Mr. Silvers' home and (2) whether law enforcement directed Mr. Silvers to his bedroom for interrogation. As a general matter, the Court found Mrs. Silvers, Defendant's sole witness, less credible. Both Government witnesses, supported by a contemporaneous FBI 302, testified that Mrs. Silvers incorrectly told agents, who conducted the search, that a cell phone on the family's couch belonged to her daughter when, in fact, the phone was Mr. Silvers.' *See id.* at 40:1-9. The Government is correct because Mr. Silvers provided the password to that phone during the interview in the bedroom. *Id.* at 11:20-21.

Moreover, some of Mrs. Silvers' testimony was inconsistent. Initially, Mrs. Silvers testified that law enforcement had already entered the home by the time she went downstairs. *Id.* at 33:25-34:1. Later, she changed her testimony and testified that she was downstairs, directly behind Mr. Silvers, when Mr. Silvers opened the door to law enforcement. *Id.* at 37:16-24. Beside the inconsistent testimony, the Government witnesses were consistent that the protective sweep did not occur until after she had been escorted outside. As to the specific salient points in dispute––(1) how law enforcement initially entered Mr. Silvers' home and (2) whether law enforcement directed Mr. Silvers to his bedroom for interrogation—the Court credits the Government witnesses' accounts.

First, the Government witnesses' testimony, supported by their contemporaneous 302s, stated that law enforcement knocked loudly on the front door of the home and announced themselves. When Mr. Silvers opened the door law enforcement "demanded" all occupants exit the home. Tr. 1 at 23:22. Only once the occupants exited the home did law enforcement enter to conduct a protective sweep. *Id.* at 25:5. Mrs. Silvers, on the other hand, testified that "a rush of agents" immediately came into the home "rather quickly" once Mr. Silvers opened the door. Law enforcement swarmed the home so quickly, Mrs. Silvers stated, that the family was "afraid that [law enforcement] would hurt [the family's] dog." *Id.* at 37:16-24

As noted above, the Court finds the Government's testimony more consistent with the purposes of the search itself. Law enforcement was investigating no more than a bribery scheme and had no reason to believe firearms or any other danger lurked in the Silvers home. After all, law enforcement had no plans to breach the home and did not carry a battering ram or any other similar device to do so. When considering the unrebutted testimony that the warrant was planned in accordance with normal FBI standards and executed according to plan, the Court finds the Government's testimony more credible.

Second, Mrs. Silvers testified that Agents Waltz and Stranahan directed Mr. Silvers up the stairs to the master bedroom for the interview. *See id.* at 39:9-10. On the other hand, Agents Waltz and Stranahan, supported by the contemporaneous FBI 302s, testified that Mr. Silvers volunteered the master bedroom as a private place for the interview and affirmatively led Agents Waltz and Stranahan to the bedroom. *Id.* at 10:2-5. As Agents Waltz and Stranahan had never been in Mr. Silvers' home before, the Court finds it improbable that they would have ordered Mr. Silvers to a location they did not already know existed. The Court therefore credits the Government witnesses' account.

6

## II. LEGAL STANDARD

"Miranda warnings are required 'where a suspect in custody is subjected to interrogation.'" *United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)); *see also Miranda v. Arizona*, 384 U.S. 346, 377 (1966) ("The principles announced today deal with the protection which must be given to the privilege against a self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way."). *Miranda* only applies when (1) a defendant is in police custody and (2) makes an admission in response to government "interrogation." *New York v. Quarles*, 467 U.S. 649, 654 (1984). Whether an individual is "in custody" for *Miranda* purposes is a two-step inquiry, ultimately asking whether "the circumstances of the questioning 'present a serious danger of coercion.'" *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020) (quoting *Howes v. Fields*, 565 U.S. 499, 408-09 (2012)).

"Custody" turns on whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation.'" *United States v. Hallford*, 756 F. App'x 1, 6 (D.C. Cir. 2018) (per curiam). "That 'reasonable person' is not the defendant, but the average person innocent of any crime." *United States v. Lea*, 839 F. App'x 551, 553 (D.C. Cir. 2020) (per curiam); *see also Florida v. Bostick*, 501 U.S. 439, 438 (1991). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Howes*, 565 U.S. at 509 (cleaned up).

"Custody need not include detention in a police facility and may even be found to exist in one's own home or bedroom." *United States v. Savoy*, 889 F. Supp. 2d 78, 108 (D.D.C. 2012)

(RCL). When police interrogate a suspect in their home, the question for *Miranda* purposes is whether "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar circumstances of the home into a 'police-dominated atmosphere.'" *Id.* (quoting *United States v. Craighead*, 539 F.3d 1073, 1083-84 (9th Cir. 2008)). The test is objective and centered on the totality of the circumstances; whether a suspect *in fact* felt free to terminate the interrogation is irrelevant. *See United States v. Richardson*, 36 F. Supp. 3d 120, 127 (D.D.C. 2014) (Brown Jackson, J.); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011).

### III.   DISCUSSION

The Court concludes that the circumstances of this case do not rise to the level of a "police-dominated atmosphere" that would have rendered Defendant "in custody" for the purposes of *Miranda*. The following facts support this conclusion.

As an initial matter, one's home is usually understood to be a less coercive atmosphere than, for example, a police station or squad car. *See United States v. Parker*, 262 F.3d 415, 420 (4th Cir. 2001). To be sure, an obtrusive search in one's home can render the environment coercive, but none of the circumstances that normally do so are present here. For example, although not determinative, law enforcement never brandished their firearms in front of the occupants, including Mr. Silvers. *See United States v. Peterson*, 506 F. Supp. 2d 21, 23 (D.D.C. 2007) (JDB) (collecting cases). Indeed, Agent Stranahan was unarmed, and Agent Waltz's sidearm was not visible. The lack of handcuffs, another circumstance usually required to render an interrogation in a defendant's home coercive, militates against a finding that Mr. Silvers was in police custody during the interview. *See United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004) (holding handcuffing does not automatically constitute custody and is just one factor to be

considered).³

After affirmatively agreeing to be interviewed, that "Defendant himself chose the setting of the interview [the bedroom], and [] led [Agents Stranahan and Waltz] to it" weigh against *Miranda* custody. *See Robinson*, 256 F. Supp. 3d at 25-26 (defendant who led interviewing law-enforcement to particular room within his suite of offices not in custody for *Miranda* purposes). Mr. Silvers evidently "also chose where to sit inside of" the bedroom. *See id.* Although approximately a dozen agents were involved in the search, including Agents Stranahan and Waltz, the number of agents did not itself keep Mr. Silvers confined to any portion of the house for the duration of the interview. *See United States v. Cottman*, 807 F. App'x 204, 206 (4th Cir. 2020) (fifteen to twenty federal agents executing warrant involving tax fraud did not support custody finding for interview in defendant's home basement); *see also United States v. Calloway*, 298 F. Supp. 2d 39, 49 (D.D.C. 2003).

There is no evidence as to whether bedroom was open or closed during the interview. Assuming *arguendo* that the door to Mr. Silvers' bedroom was closed for the duration of the interview, that does not make the interview custodial. Consider, for example, *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010), in which that court concluded that the defendant was not in custody while interviewed in his kitchen even where an interviewing agent stood blocking the kitchen's exit. *Id.* at 179 (nor did the presence of ten to fifteen armed law enforcement officers support custody finding). Defendant remained free to leave through the unlocked door at any time, and subsequently did "walk[] out by himself, while his interviewers remained inside," at the

---

³ *See also, e.g.*, *United States v. Robinson*, 256 F. Supp. 3d 15, 27 (D.D.C. 2017) (CKK) ("that 'no meaningful physical restraint was applied to the defendant' supported finding that interrogation was non-custodial" (quoting *United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011)); *Parker*, 262 F.3d at 419 (that defendant "was not handcuffed or restrained[] and [law enforcement] did not draw their weapons in [defendant's] presence" during interrogation "in [defendant's] own home] support finding that interrogation was non-custodial).

9

conclusion of the interview. *See Robinson*, 256 F. Supp. 3d at 27. Indeed, Mr. Silvers would have seen that the door was unlocked during the interview given another law enforcement officer entered the room in the midst of the interview. Moreover, although Defendant's subjective belief is irrelevant to the present inquiry, the Court notes that Defendant ended the interview by informing Agents Stranahan and Waltz that he would like to speak to his attorney before completing a written statement. As such, it is a reasonable inference that Defendant was aware of his *Miranda* rights at the time of the interview and nevertheless consented to it.

Finally, although law enforcement never affirmatively told Mr. Silvers that he was free to leave, the absence of such a statement does not render an interview custodial. *See United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). Of decisions in this jurisdiction where such an assurance was absent and the court found the defendant to have been in custody, these cases are *far* more extreme than the circumstances in this case. For example, in *Peterson*, the court determined that the defendant was in custody when questioned by police officers during the execution of a search warrant where he had recently been arrested prior to the search, a SWAT team had used a battering ram to enter through the front door, yelled "police with a warrant, everybody down," "had their weapons drawn, which included sub-machine guns, shotguns, and rifles," brought the defendant to a particular location of their choosing, and handcuffed him. 506 F. Supp. 2d at 24. In *Savoy*, the court found that the defendant was in custody during the execution of a search warrant when armed FBI agents and police officers in "tactical gear" forcibly entered the defendant's home, handcuffed him and his family members, and defendant "had to be accompanied to the restroom." 889 F. Supp. 2d 7at 106-10. Finally, in *Richardson*, the court found that the defendant was in custody where FBI agents used a battering ram, ordered the defendant to "come out" with his "hands in their air," had their weapons drawn and aimed at the

10

defendant, and handcuffed him. 36 F. Supp. 3d at 129-31.

The facts of this case are nothing like the facts of *Peterson*, *Savoy*, or *Richardson*. Law enforcement did not break down Mr. Silvers' door, much less carry a battering ram. They did not rush in with weapons drawn. No law enforcement officer unholstered their weapon in the presence of Mr. Silvers or his family, nor did any law enforcement officer ever yell at Defendant or his family. Mr. Silvers was never handcuffed, and there is no evidence law enforcement "escorted" Defendant anywhere. Indeed, it was Mr. Silvers who chose the location of the interview and led Agents Stranahan and Waltz to it.

### IV.     CONCLUSION

In sum, the Court includes that Defendant was not in custody during the October 28, 2019 interview. Because Defendant was not in custody, *Miranda* warnings were not required. Therefore, it is hereby

**ORDERED**, that Defendant's [16] Motion to Suppress Statements is **DENIED**

**SO ORDERED.**

Dated: August 11, 2022

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge