**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-124 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **FREDERICK SILVERS** | : | |
| **Defendant.** | : | |

## DEFENDANT FRED SILVERS' SENTENCING MEMORANDUM

# I.   INTRODUCTION

Frederick Leon Silvers, by his undersigned counsel, respectfully files this Sentencing Memorandum. Mr. Silvers has pleaded guilty to Bribery in violation of 18 U.S.C. §201 (b) (1) (c) He deeply regrets the choices he made and accepts responsibility for them. He respectfully requests that the Court consider the facts set forth below in fashioning a fair and just sentence.

### *Frederick Silvers' Background*

Mr. Silvers was born on January 8, 1965, in Winnsboro, South Carolina. He is the second of four children born to the marriage of Thomas and Bobbie Jean Silvers (nee: Squirewell). The defendant did not have a relationship with his father after his mother and his siblings relocated the family, along with extended family members, from South Carolina to Northeast Washington, DC in 1972. His father has another family, but Mr. Silvers knows nothing about the children born to his father from this relationship. Mr. Silvers who was 7 years of age had no contact with his father after the move to Washington, DC.

Mr. Silvers' mother was part of the great migration of African Americans who moved north from the south to escape Jim Crow and to pursue employment. She eventually obtained

employment as a dental assistant, a position from which she retired. He and his siblings were raised solely by his mother. His mother is 84 years old and resides with the defendant's brother, Berkley Silvers, in Northeast, Washington, DC. Mr. Silvers mother suffered a stroke in 2013 and is also a breast and colon cancer survivor. She also suffers from dementia and has limited moments of "clarity." Mr. Silvers credits his mother for his great childhood. As a single parent of four children, she provided them a cohesive family environment with emotional and financial support. She was the sole support of the family. Mr. Silvers recognized that his mother was a "good woman", a sentiment he still holds and for which he is forever grateful. Although he did not have a father figure during his formative years, he had positive male role models growing up.

Mr. Silvers has three sisters who live locally and with whom he has a relationship. He had 3 maternal half-siblings locally, only two of whom are living. Two of his half-siblings died at early ages. Mr. Silvers also had close relationships with his cousins who lived locally.

In his juvenile years, Mr. Silvers began running around with the wrong crowd and he began getting in legal trouble. His mother's instinct was that Mr. Silvers was suffering from depression and that was the cause of his moodiness, bad temper and bad behavior. His mother sent him to a psychologist in Washington, DC weekly for approximately one year. The defendant was also enrolled in boxing classes which he continued for two to three years. The boxing occupied his time and taught him self-discipline. During this time, a community police officer befriended Mr. Silvers, a friendship that had a positive influence on Mr. Silvers resulting in him changing his behavior and his direction in life. Mr. Silvers has not been involved with the criminal justice system as an adult. Mr. Silvers has no previous convictions. The instant offense is his sole contact with the criminal justice system since changing his direction in life.

Mr. Silvers is introspective. Even as a high school student, he recognized that he was getting in trouble and not attending classes, so he dropped out of school to remove himself from

the negative environment choosing instead to get a GED because he considered education to be his path to a good job. He then obtained a paralegal education and eventually a college degree. Mr. Silver has always been a hard worker and sought out job opportunities to better himself and his family. He went from working as a property manager to owning his own real estate management company. Unfortunately, the conduct that brings him before the Court required him to seek other opportunities because his business required him to be licensed and he knew that a felony conviction would result in his losing his license. Knowing this to be the case, Mr. Silvers then entered into the solar energy business. Initially as a salesperson so he could learn the industry and now he owns and operates a solar energy installation company. He went into solar because he saw the growth of this industry. While his company is in its infancy stages and provides him with marginal income, he expects his business to grow in the future.

Mr. Silvers is a naturally friendly and extraordinarily generous person. He was well known in the Department of Housing and Community Development. He was known to help tenants and landlords alike who were trying to navigate the sometimes-complicated procedures and divisions within DHCD. He was always willing to lend a pro bono helping hand. This character trait - normally a very positive value - is exactly what brought Mr. Silvers to grief, when he crossed the line in his gifts to Ms. Dawn Dorsey. What started out as friend helping another friend with no money involved resulted in acts which were unlawful. Ms. Dorsey had been giving TOPA information to Mr. Silvers without a *quid pro quo* as far back as 2013. Mr. Silvers knows that what he did was wrong, and he regrets every day that he did not act with more integrity. He has tried to make amends for his wrongdoing by getting out of property management and pleading guilty. Mr. Silvers was not a not a major developer nor did he profit from his wrongdoing, but he knows now he acted unlawfully. It is significant that Ms. Dorsey did not implicate Mr. Silvers initially in any wrongdoing. Ms. Dorsey denied that Mr. Silvers had given her anything of value.

When she was confronted with evidence to the contrary, she recanted her statement. As noted in the Presentence Investigation Report, Ms. Dorsey initially was giving TOPA information to Mr. Silvers gratis. When Ms. Dorsey began sharing the financial difficulties she was having as a single parent of four children Mr. Silvers began giving her money. It should be noted as well that Mr. Silvers never denied giving money to Ms. Dorsey when asked by the FBI. He admitted giving her money, but he denied that it was done with criminal intent as a lay person. He now understands that giving money to federal official under the circumstances described in the information is unlawful.

### *Sentencing Request*

Based upon Mr. Silvers personal history and background, the nature and circumstances, his lack of criminal history, the almost nonexistent likelihood of recidivism and his cooperation in the meeting with the government to determine if he had any other useful information about TOPA and/or other employees who may have engaged in criminal activity, Mr. Silvers respectfully requests that the Court impose a sentence of probation with community service. Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a). Further, it would permit him to continue working. In his solar business, he has to travel locally to the homes of consumers who are interested in installing solar as an alternate source of electricity.

## II. THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an

individualized assessment based on the facts presented," *Gall* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *See also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *Pepper* at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper* at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)). In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## III. THE U.S. SENTENCING GUIDELINES

The parties and the Probation Officer agree that the following Sentencing Guidelines sections apply:

**Offense Level Computation** (2021 US Sentencing Guidelines)

1. Count 1: Bribery, 18 USC § 201(b)(1)(C)

2. **Base Offense Level:** The guideline for 18 USC § 201(b)(1)(C) offenses is found in USSG §2C1.1 of the guidelines and the base offense level is 12. USSG §2C1.1(a).   **12**

3. **Specific Offense Characteristics:** The offense involved more than one bribe (to wit: the defendant provided bribes to Dawne Dorsey on at least eight occasions); therefore, two levels are added. USSG §2C1.1(b)(1).   **+2**

4. Victim Related Adjustment: None.   **0**

5. Adjustment for Role in the Offense: None.   **0**

6. Adjustment for Obstruction of Justice: None.   **0**

7. Adjusted Offense Level (Subtotal):   **14**

8. Chapter Four Enhancement: None.   **0**

9. **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).   **-2**

10. **Total Offense Level:**   **12**

In addition, Mr. Silvers met voluntarily with the Assistant United States attorney on this case to assist the government in its investigation of the TOPA program and to determine if he could provide the Government with other useful information regarding any other criminal activity. Mr. Silvers was debriefed fully by the Government, but he did not have information that was useful to the Government with regard to Mr. Brian Bailey or Mr. David Paitsel or any other unlawful

conduct in the Department of Housing and Community Development. However, Mr. Silvers did give the government better insight and understanding of TOPA and showed the Government that confidential information of tenants could be ascertained from other DHCD databases with an address of the building being converted. Because Mr. Silvers' Guideline Range is less than 16 prior to the USSG §3E1.1(a) reduction, he does not qualify for a further reduction under USSG §3E1.1(b). Otherwise, he would be eligible for a further 1-point reduction. He asks this court to consider his cooperation with the government and reduce his Total Offense Level by an additional 2 points t which the Court is free to depart in determining an appropriate sentence which the Court if free thereby giving him a total offense level of 10.

## IV. 18 U.S.C. § 3553(A) FACTORS

### A.     The Nature and Circumstances of the Offense.

Mr. Silvers admits that he paid money to Dawne Dorsey for her to give him TOPA information thereby causing her to violate her official duty as a District of Columbia public official. Mr. Silvers regrets and is ashamed of his participation in paying bribes to Ms. Dorsey. He does not deny that this conduct was unlawful, and he makes no excuse for it. By his plea and his agreement to cooperate, he publicly and tangibly recognizes his wrongdoing.

While Mr. Silvers takes responsibility for his actions, it is also worth mentioning that the Statement of Facts notes that as early as 2013, Ms. Dorsey began sharing TOPA Offer of Sale Notices with Mr. Silvers for free. "As early as 2013, Ms. Dorsey began sharing TOPA offer of sale notices with Mr. Silvers; at that time, Mr. Silvers did not provide anything of value to Ms. Dorsey. Throughout their relationship, Ms. Dorsey and Mr. Silvers discussed Ms. Dorsey's career (defendant Silvers had considered hiring her), and Ms. Dorsey's financial struggles as a single parent with three children. (See PSI ¶ 17). It is terribly unfortunate that Mr. Silvers did not have the intestinal fortitude to simply be empathetic to Ms. Dorsey's financial situation, not

give her money, and for him to play by the rules. He has paid, and will continue to pay, a heavy price for that mistake. Because of his felony conviction, he will not be eligible to renew his real estate license, a profession in which he has been involved for nearly 30 years.

With regard to the circumstances of the offense, it is important to take exception to the Presentence investigator's description of the Brian Bailey and David Paistel as related cases to Mr. Silvers' offense. Mr. Silvers had never worked with either Mr. Bailey or Mr. Paistel. Mr. Silvers did not know either of these men, although he knew of Mr. Bailey as being a TOPA developer. The only relation between these cases is that the underlying offenses involved TOPA and Ms. Dawne Dorsey.

### B.   Mr. Silvers' Work History and Personal Characteristics.

#### 1.   Work History, Work Ethic and Education

Mr. Silvers' mother inculcated in him the value of hard work by example and word. As a child, he and his siblings, were expected to work around the family home, and shoulder their share of the chores. Mr. Silvers first began working outside of the family home when he was in high school, and his strong work ethic served him well later in life. When he dropped out of high school because of negative influences, he began working and studying for his GED. Upon obtaining his GED, he went to school to become a paralegal. This was not enough to satisfy his thirst for education and a career, so he enrolled in Howard University. Unfortunately, he could not afford this private education and he had to drop out prior to graduation but he was not discouraged. He went on to complete his education at the University of the District of Columbia which was within his financial means and obtained his undergraduate degree. It should be noted that his belief and thirst for education was passed on to his children all of whom graduated from college

. Once Mr. Silvers finished his education, he began to pursue his career in real estate

management and real estate sales. From 1996 to 2009, Mr. Silvers worked as a property manager and in-house real estate agent for Bojan Realty, a subsidiary of Vilory Construction Corporation, in Southeast Washington, DC. He was a full-time employee and earned approximately $120,000 annually, including commissions. While employed by Bojan, Mr. Silvers opened his own company, Silvers Realty Management, which he operated while also working for Bojan. He left employment with Bojan in 2009 to focus on his own company. Mr. Silvers assigned TOPA to Silvers Realty Management or assigns in his practice. Mr. Silvers did not monetize any of the properties in the TOPA documents that Ms. Dorsey gave to him in exchange of the money given to her. A review of the Presentence Investigation of Mr Silvers employment history clearly demonstrates that Mr. Silvers has a consistent work history. As noted earlier, Mr. Silvers organized a solar energy company after he worked for a solar company as a salesperson, and he saw he could earn a living in solar. He chose the solar industry in anticipation of his being ineligible to remain in real estate management and sales.

### 2. Personal Characteristics

In addition to Mr. Silvers' strong work and education ethic, he is a genuinely friendly and generous person. He is well-known in the Department of Housing and Community Development where he interacted with staff and patrons alike. He is known as a person who helped tenants and landlords alike to navigate the various divisions in DHCD and the regulations helping persons to complete. Attached is a letter from Ms. Christine McKeever that describes Mr. Silvers generosity that she observed while employed at DHCD. *Exhibit No. 1.*

Mr. Silvers is also an advocate for education and the community.in which he lives. He volunteered at his son's local high school and continued to volunteer after his son graduated and went to college. Mr. Silvers continues to serve as President of the Clippers Gridiron Booster Club. Mr. Craig Jefferies a teacher and football coach at Oxon Hill High School describes Mr. Silvers'

work at Oxon Hill High School. Mr. Jefferies also states that he has always found Mr. Silvers to be "a man of integrity" and that Mr. Silvers shared some of the details regarding this case and Mr. Silvers' disclosure did not change Mr. Jefferies opinion of him. *See, Exhibit No. 2.* This view of Mr. Silvers is also shared by Ms. Elizabeth Faison who has know Mr. Silvers for seventeen years and has always known him as a community advocate, volunteer, education champion and a generous person with his time and money. *See, Exhibit No. 3.*

Mr. Silvers' altruism, unselfishness and caring for others is also reaffirmed by The Rev. Elizabeth W. Tomlinson, Priest in Charge, St. Paul's Episcopal Church, Bailey's Crossroads, VA. where Mr. Silvers has worshipped for years, served as Senior Warden for 3 years and engaged in the life of the congregation. *See, Exhibit No. 4.*

### 3. Mr. Silvers' Documented Health Concerns

Mr. Silvers has several ongoing health concerns for which he takes prescribed medication. He has GERD for which he takes Nexium. The GERD was significant enough of a health problem that he underwent a biopsy in August 2022 under orders of his treating physician. Mr. Silvers also has two blocked arteries which appears to have resolved but he still takes Lipitor to control his cholesterol, and Bystolic to thin his blood. Mr. Silvers suffers from nerve damage in his hands as a result of loss of cartilage at the C-4, C-5 levels of his cervical spine. The nerve damage causes bilateral weakness and numbness in his hands and weakness in his shoulders. These conditions are being treated three physicians, one of whom is a neurologist, and another is a rheumatoid arthritis specialist. Mr. Silvers also has a family history of heart disease and cancer.

Mr. Silvers' pre-existing health conditions show that he suffers from multiple conditions that place him at heightened risk for serious illness if he contracts COVID-19. And he will have a greater risk of infection and resulting complications if he is incarcerated. Because of the congregate living arrangements in homeless shelters and correctional and detention facilities, the risk of COVID-19 transmission is higher in these settings compared with the general population. In addition, there is a high

prevalence of <u>certain medical conditions</u> associated with severe COVID-19 among people experiencing homelessness and among people who are incarcerated, increasing the risk for severe outcomes from COVID-19 in these populations. According to the CDC, COVID-19 is likely to spread more quickly in correctional facilities than in non-correctional environments. *See https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.* (last updated November 29, 2022 *see also Coreas v. Bounds*, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."). Incarcerated individuals are often housed in close quarters, with limited access to cleaning supplies and PPE, and limited ability to engage in social distancing. *CDC Guidance for Correctional Facilities, supra; see also Coreas, 451 F. Supp. 3d at 414.*

Numerous courts have found that this increased risk is a basis for reducing an already incarcerated individuals sentence under the Cares Act. See, e.g. *United States v. Greene*, 516 F. Supp. 3d 1, 20 (D.D.C. 2021); *United States v. Baylor*, No. CR 16-0180 (ESH), 2020 WL 5970679, at *2 (D.D.C. Oct. 8, 2020); *United States v. Hunter*, No. CR 11-039 (PLF), 2020 WL 5748115, at *4 (D.D.C. Sept. 25, 2020); *United States v. Curtis*, No. CR 03-533 (BAH), 2020 WL 1935543, at *6 (D.D.C. Apr. 22, 2020); *United States v. Dhavale*, No. 19-MJ-00092, 2020 WL 1935544, at *6 (D.D.C. Apr. 21, 2020); *United States v. Hammond*, No. CR 02-294 (BAH), 2020 WL 1891980, *10 (D.D.C. Apr. 16, 2020);*United States v. Speed*, No. SAG-10-0700, ECF No. 166 (D. Md. Nov. 5, 2020); *United States v. Chambers*, No. PX-99-0451, ECF No. 129 (D. Md. Oct. 23, 2020); *United States v. Cuevas*, Crim. No. GJH-16-0451, ECF No. 231 (D. Md. Aug. 3, 2020); *United States v. White*, Crim. No. CCB-09-0369, ECF No. 142 (D. Md. July 10, 2020); *United States v. McRae*, Crim. No. PJM-10-0127, ECF No. 134 (D. Md. July 7, 2020). Here, it is also a basis for a non-custodial sentence. The number of COVID Cases with the new Omicron variant are rising again.

The fact that Mr. Silvers has been vaccinated does not change the analysis. As Judge Paul

Grimm held in *United States v. Palmer*, 8:13-cr-00623-PWG, (D. Md. July 29, 2021), (copy attached, Exhibit 5),while "[v]accines are effective at preventing COVID-19," "effectiveness is not guaranteed," "there are unknowns regarding the extent and duration of the vaccine's protection," and "there may still be concern for particular individuals' increased risk of severe illness, even if fully vaccinated." Thus, Judge Grimm found that Mr. Palmer's increased risk of COVID-19 complications due to his underlying medical conditions established "extraordinary and compelling reasons" for compassionate release. This is even more critical now because the new Omicron variants specifically XBB.1.5 spread more easily than earlier variants, including the Delta variant. Data also suggest that Omicron can cause reinfection. See, https://www.cdc.gov/coronavirus/2019- ncov/variants/index.html?s_cid=11773:

omnicron%20variant:sem.ga:p:RG:GM:gen:PTN:FY22.

Mr. Silvers' increased risk of serious illness if he is incarcerated is an additional reason why Mr. Silvers should not receive a custodial sentence, and a basis for a downward departure.

    C.    Similar Cases

The probation department in its investigation of Mr. Silvers refers to the cases of Brian Bailey and David Paistel as "related cases". As noted earlier in this memorandum, there is no relation between these cases and the Mr. Silvers' case. Mr Silvers had nothing to do with the bribery and conspiracy charges involving Mr. Bailey and Mr. Paistel. The only relation between the instant case and Bailey and Paistel is that the bribery involved the same government official. However, Mr. Silvers did not act in concert with these men. Mr. Silvers acted alone with Ms. Dorsey. Mr. Bailey and Mr. Paistel were found guilty by a jury of conspiracy and bribery. However, these men have not yet been sentenced. As such, Mr. Silvers asks this Court to consider sentences imposed in this District in other bribery cases to avoid sentence disparity.

In this regard, the Court asks this Court to consider the sentences imposed on the defendant in United States of America vs. Eric Schneider, **1:20-cr-00224-CJN.** Mr. Schneider pleaded guilty to Conspiracy to Violate the Procurement Integrity Act, 18 U.S.C. § 371, and

Obstruction of Justice, 18 U.S.C. § 1503. From 1999 to February 2019, Mr. Schneider was the Chief Operating Officer and 49 percent owner of Communications Resources, Inc. ("CRI") in McLean, Virginia. CRI provided program management, situational awareness software, physical and electronic security services, IT system oversight, and system requirement development to its customers. The company employed between 125 and 160 people at its highest point. Besides his bribery of a high-level government official, Mr. Schneider also obstructed justice by instructing subordinates to delete emails responsive to a grand jury subpoena. Mr. Schneider was sentenced to 48 months of probation on each count to run concurrently.

In the case of *United States of America v. Richard Holman, CR21-202 (CJN)*, the Defendant Richard Holman, the high-ranking government official who accepted bribes from Mr. Schneider, pleaded guilty to one count of bribery. Mr. Holman was sentenced to probation for a term of 48 months with the first 180 days to be served as home confinement.

One of the purposes of the Sentencing Reform Act was to create a "sentencing scheme in which those who commit crimes of similar severity under similar circumstances receive similar sentences." *Hughes v. United States*, 138 F.Ct. 1765, 176 (2018). Thus, "similar offenders engaged in similar conduct should be sentencing equivalently." *Sentencing of Multiple Defendants,* 12A James Buchwalter & Thomas Schmitt, Cyclopedia of Federal Practice §50:32(3d Ed. Sept. 2021).

It is Mr. Silvers' position that while his conduct was unlawful, the conduct of Mr. Schneider and Mr. Holman was worse because in Mr. Schneider's case he obstructed justice besides committing bribery, and in Mr. Holman's case he was a high-level government official who solicited bribes. The conduct of both men involved significant sums of gratuities paid to Mr. Holman and significant government contracts received by Mr. Schneider's' company.

There is a second sentencing principle that suggests that Mr. Silvers' case justifies a departure. Because society recognizes the important role that cooperation plays in the criminal justice system, cooperators frequently and normally receive a more lenient sentence for their cooperation. It is both an encouragement for offenders to assist law enforcement, and also a tangible sign of repentance and desire to make amends for wrongdoing. Thus, courts routinely hold that cooperation is a factor that may justify "giving co- defendants widely different sentences." *United States v. Wheeler*, 802 F.2d 778, 783 (5th Cir.( 1986). Admittedly, Mr. Silvers' debriefing did not lead to other unlawful activities at DHCD, he did cooperate with the government volunatarily, and he shared his knowledge of DHCD and TOPA. To be sure, Mr. Silvers was not obligated to be debriefed, he did so to make amends.

**D.     Mr. Silvers Poses Little or No Risk of Recidivism.**

One of the purposes of sentencing is the desire to protect the public from further crimes by the defendant. This practical concern can be and has been measured and analyzed.

Mr. Silvers is fifty-eight years old. He has stopped his real estate practice and will never be in a position to commit any similar act. He is in a new industry that does not involve contact with the government. He sells solar energy installation to consumers. Mr. Silvers does not fit the archetype of a person who will commit new criminal offenses or recidivate. Mr. Silvers has not had prior contact with the criminal justice system as an adult. He has three children with whom he has a great relationship and is active in his community. The Court should take this data into consideration in its sentencing calculation.

This Court's role under Section 3553 is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense

level has

long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker* allows this Court to remedy this inconsistency.

In addition, the Commission has also objectively quantified the low likelihood of recidivism for an offender like Mr. Silvers. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. Mr. Silvers is 58 years old. Defendants over the age of 50 with no criminal history have a recidivism rate of only 6.2 %. *Id.* at 28. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. silvers would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Silvers are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S. Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Only 11.7% of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). *First Offender* at Exhibit 6. The Guidelines' offense levels do not take this data into consideration. But this Court can and should. Given Mr. Silvers' background, age, and the nature of the offense itself, the likelihood of Mr. Silvers re-offending is extremely low, approaching zero.

    **E.**    Mr. Silvers' Professional Demise Serves as Adequate Deterrence to

      Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." There is no need for personal deterrence in this case for the reasons stated above. Nor is there a need for a custodial sentence to deter others. The consequences already imposed on Mr. Silvers- the loss of his profession in real estate, the loss of his company, Silvers' Realty Management, the loss of his career, the loss of his good name and reputation and the respect of his colleagues - have been sufficiently impactful to send a strong message to any other individual interacting with government officials considering a comparable course of conduct.

## V. CONCLUSION

Mr. Silvers loved his career in real estate. It was a career in which he had been involved since finishing school first as an apartment manager, then property management and then with his own company, Silvers Realty Management, LLC selling, managing real estate and acting as a TOPA specialist. Mr. Silvers loved his company and his interactions with tenants and landlords alike, always giving a heling hand when he could. The many associations and colleagues he had in D.C. Department of Housing and Community Development are severed with this felony conviction. That is all gone. Moreover, he shared his fall from grace with his children which was difficult for him since he always preaches integrity to them. He will live with the knowledge, and the regret, that he committed these offenses. He assures the Court that he will live out the rest of his life as a law-abiding citizen and will do his very best to regain his good name. He stands ready to accept whatever sentence this Court deems appropriate.

Respectfully submitted,

Robinson & Geraldo, PC

/S/

Manuel R. Geraldo, DC Bar 260216
1316 Pennsylvania Ave., SE
Washington, DC 20003
T. 202.544.2888
F. 202.547.8342
Mgeraldo@rglaw.net

## *CERTIICATE OF SERVICE*

I hereby certify that a copy of the foregoing Sentencing Memorandum was e-served on

Elizabeth Aloi, Assistant United States Attorney this 3rd day of January 2023.

/S/

Manuel R. Geraldo